**EQUAL EMPLOYMENT OPPORTUNITY COMMISSION,** Plaintiff,

v.

**JOE'S STONE CRAB, INC., Defendant.**

No. 93–1082–CIV.

United States District Court, S.D. Florida.

July 3, 1997.

Gedety Serralta, Donald Tyler, Miami District Office, EEOC, Miami, FL, for Plaintiff.

Robert D. Soloff, Donald M. Papy, Kim L. Picasio, Fort Lauderdale, FL, for Defendant.

### PARTIAL FINAL JUDGMENT FINDING JOE'S STONE CRAB, INC. GUILTY OF SEX DISCRIMINATION

HURLEY, District Judge.

THIS CASE, tried to the court, involves allegations of sex discrimination in the hiring of food servers at a Miami Beach restaurant.

The plaintiff, Equal Employment Opportunity Commission (EEOC), contends that the defendant, Joe's Stone Crab, Inc., the owner and operator of Joe's Stone Crab Restaurant (Joe's or "the restaurant"), intentionally discriminates against women by refusing to hire them for food server positions in violation of § 703 of Title VII of the Civil Rights Act of 1964, as amended. Alternatively, the EEOC contends that Joe's violates Title VII by using hiring practices that have a disproportionate and adverse impact upon women. Based on an evaluation of the evidence, the court finds that the EEOC has not proved intentional discrimination. It has established, however, that Joe's uses employment practices that have an illegal disproportionate impact on women. Since the law treats such disproportionate impact to be the functional equivalent of intentional discrimination, the court grants partial final judgment on liability in favor of the plaintiff EEOC. The court also reserves jurisdiction to conduct a separate trial on damages and other affirmative and injunctive relief at a future setting.

### FINDINGS OF FACT

#### A. General Historical Background

1. Joe's Stone Crab Restaurant is a landmark on Miami Beach. Founded in 1913, two years before the incorporation of the City of Miami Beach, Joe's opened in a small wooden bungalow where customers were served on the front porch. Today, still at the same site, Joe's occupies an enlarged facility that seats approximately 440 patrons. It consists of several dining rooms and bar areas, a kitchen, a take-out section, an office, a laundry and a multi-story parking garage. The restaurant serves up to 1450 dinners each mid-week evening during the stone crab season, which lasts from October to May. Between 1500 and 1800 dinners are served on busy weekend nights. Long lines and waiting periods are commonplace. Indeed, Joe's is so popular that patrons have been known to come directly from the airport with luggage in hand.

2. Joe's is owned by and has been under the continuous management of the same fam-

ily (now the fourth generation) since the restaurant opened. From the first years, when it was literally a "mom-and-pop" operation, the restaurant gradually added staff, first with relatives and then others. By the late 1970s and early 1980s, Joe's had become a large, thriving enterprise, and consequently, the owners delegated hiring decisions to department heads. In 1985, Grace Weiss and Jesse Weiss, the daughter-in-law and son of the founders, respectively, retired and passed the managerial reins to their daughter Jo Ann. She embarked on an ambitious program of updating the menu, expanding the restaurant and refurbishing the physical plant. Despite what she described as an "all-encompassing role," she continued the policy of delegating hiring decisions to department heads. The head waiter or maître d' continued to have complete authority over the hiring of food servers.

3. Today, Joe's employs between 230 and 260 employees, most of whom work in departments unconnected with this litigation, e.g., kitchen, laundry, shipping, take-away and cashiering. For many years, the food serving staff numbered about thirty. This figure increased to seventy when Joe's added a luncheon shift in 1979. Throughout its history, Joe's has experienced extraordinary employee loyalty and longevity. This is due, in part, to a generous benefits package which includes individual and family health coverage, dental benefits and profit sharing. Several employees compared the working atmosphere at Joe's to that of a large, caring family, and cited examples of the owners' generosity to employees in need. Grace Weiss, the former owner and manager for many years, testified that "people have worked for us for twenty, thirty, forty years—their whole work experience." For example, Calvin Keel, the head of the kitchen department, has been at Joe's for over thirty-eight years. An expert in restaurant management testified that "[v]ery few restaurants have as low a turnover as Joe's."

4. Low turnover and the widely-recognized potential to make "good money" combine to make food server positions at Joe's scarce and coveted. Employees whose wages are largely dependent on tips benefit from the moderate to expensive bill that follows a dinner of stone crabs or other entrees plus à la carte side dishes. Compensation is further enhanced by the busy pace at Joe's. In an industry where the norm is two and one-half table turnovers per night, Joe's regularly turns a table four to five times a night. Thus, from a food server's perspective, Joe's is a gold mine. One applicant offered this understated description: [Joe's is a] "good place to work, money's good, get summers off and you get benefits."

## B. History of Male Server Tradition

5. Women have worked at Joe's throughout its history. In fact, women have predominated as owner/managers. Nonetheless, most of Joe's female employees have worked in positions traditionally viewed as "women's jobs," e.g., as cashiers or laundry workers. Food servers generally have been male. For a brief period during World War II, women worked as food servers, but for the most part these positions reverted to men at the conclusion of the war. From 1950 on, the food serving staff has been almost exclusively male. Indeed, one striking exception proves the rule. Dotty Malone worked as a food server at Joe's for seventeen years, and for most of this time she was the lone female on a serving staff that ranged between twenty-four and thirty-two.

6. The evidence presented at trial does not establish that Joe's management had an express policy of excluding women from food server positions. To the contrary, the evidence portrays owner/managers who have been courageous in opposing overt discrimination. For example, Joe's was picketed for two years when the owners insisted on hiring African–American employees who had been excluded from union members hip because of race. What the evidence in this case does prove is that Joe's management acquiesced in and gave silent approbation to the notion that male food servers were preferable to female food servers. Grace Weiss hinted as much when she said:

> In spite of the fact that the restaurant has been run predominately by females (myself and my daughter) for the past 45 years, we have always had mostly male servers. We have a mixture of young and old, black,

white and Oriental waiters, and occasionally female servers. I cannot explain the predominance of male servers, but perhaps it has to do with the very heavy trays to be carried, *the ambience of the restaurant* and the extremely low turnover in servers. (Emphasis supplied.)

Recent experience at Joe's, gained when the restaurant hired several female food servers after the start of the EEOC's investigation, establishes beyond a doubt that women have the physical strength to carry serving trays. Witness after witness from Joe's senior staff, including Anthony Arneson, the daytime maître d' personally responsible for all wait staff hiring from 1987 to 1991, and night captain Dennis Sutton, who assisted him in that capacity after 1991, attested to the fact that women are capable of performing every aspect of a food server's job at Joe's.

7. With such evidence, low turnover does not explain the near total absence of women among new hires in this one sector of the restaurant's work force. Rather, Grace Weiss provided a clue to the true cause with her reference to the "ambience of the restaurant." Roy Garret, described by Joe's as its "legendary maître d'," provided more insight when he gave this testimony:

As I said before, we had very few female applicants over the years. It was sort of tradition.... It was always tradition from the time I arrived there that it was a male server type of job. And until just recently when we became aware that we had to do other things, ... originally it was traditionally a male place. We always had women that were qualified women.... Traditionally, I mean, it's just some restaurants, when you walk in, you know there are going to be women waitresses, other restaurants you know it is going to be male waiters.

In the same vein, Joe's general manager Robert Moorehead responded to a question about the lack of female food servers by admitting that it never struck him as odd that female food servers were not being hired. Clearly, what prevailed at Joe's, albeit not mandated by written policy or verbal direction, was the ethos that female food servers were not to be hired.

8. Karen McNeil, Joe's trial expert in restaurant management, provided this historical explanation:

It has been an attitude and standard, it comes from Europe. In all of Europe you will find in all of the grade three restaurants in Europe, there is an impression that service at that high level is the environment of men, and that it ought to be that way. And I think that that attitude a few decades ago came and was felt a little bit here in this country....

Those [European] opinions and those sensibilities, I think were in fact carried here by restauranteurs who hoped to create something serious. If you wanted to create a serious restaurant that would become known in the community, that would become one of the community's great restaurants, you did what they did in Europe, you modeled yourself after them. I don't think anybody thought about it. They said, well, men did it there. It tended to be men here, too, who had those skill sets, and so men were [sic] automatically became the labor pool.

Ms. McNeil is not alone in noting these historical antecedents. A recent newspaper article discussing the prevalence of male-only serving staffs in some of New York City's elite eating establishments cited a captain at an East Side restaurant, who explained: "There is no tradition of women working in dining rooms in Italy. The men wouldn't know how to handle the situation, especially if it meant working with American women." Frank J. Prial, *Who Says Women Can't Do This Job?*, N.Y. Times, October 23, 1996. Such notions may seem silly and antiquated when measured by today's standards of gender equality, but no one can dispute that they are deeply rooted in our cultural traditions. Take, for example, this dictum by America's ultimate arbiter of propriety and decorum: "If the servants are efficient and well trained, a small (that is, for no more than twelve) formal dinner may be beautifully handled by a cook, a butler, and a footman. The footman may be replaced by a maid, *but at a truly formal dinner, men should serve the meal.*" Elizabeth L. Post, *Emily Post's Etiquette* (12th ed., Funk & Wagnalls 1969)

(emphasis supplied). Joe's sought to emulate Old World traditions by creating an ambience in which tuxedo-clad men served its distinctive menu.

### C. Joe's Employment Practices

9. Joe's conducts a "roll call" each year to recruit new servers and fill other positions. Held on the second Tuesday in October, it is rarely advertised but is widely known throughout the local food server community. Usually, about 100 applicants attend. The evidence indicates that very few women—perhaps no more than two or three each year—attended the annual roll call from 1986 to 1990. During this five year period, the restaurant hired 108 food servers, all of whom were male. On June 17, 1991, the EEOC filed the charge instigating the investigation of Joe's hiring practices. Between July 1991 and December 1995, the restaurant hired eighty-eight new food servers, nineteen of whom were female.

10. A roll call for any given year typically runs as follows. Applicants for server positions arrive at the roll call early in the morning, complete a written application, listen to introductory remarks, and then participate in an individual interview. The applicants selected from the roll call to fill server openings trail experienced servers for three days, which time serves both as a training period and a probationary period. After successful completion of the trailing process, all new food servers start on the luncheon shift. Beginning in their second year, if successful, they migrate to the dinner shift as vacancies occur.

11. In 1986, daytime maître d' Raymond Damiano was responsible for interviewing and hiring new servers, and dinner maître d' Roy Garret sometimes assisted him in the interviewing. Beginning with the 1987 roll call, daytime maître d' Anthony B. Arneson was given sole responsibility for hiring new food servers. Mr. Arneson performed this function without the guidance of written or verbal policies. Rather, he relied on what he described as his "gut feeling" in evaluating applicants from four perspectives: (1) appearance, (2) articulation, (3) attitude and (4) experience. "My decisions," he said, "were based only on what I had to work with, the interview ... and my professional judgment."

12. The EEOC filed its charge of discrimination in June of 1991. Thereafter, and surely in response to the EEOC's expressed interest, Mr. Arneson was directed by the management to conduct interviews in conjunction with a panel composed of assistant dinner maître d' Dennis Sutton and general manager Robert Moorehead. In subsequent years, other employees, both male and female, served on the panel. Since 1992, each applicant has also been asked to demonstrate his or her ability to carry a loaded serving tray. Any applicant's failure to pass the tray test results in automatic disqualification because Joe's regards this ability as an indispensable job prerequisite. Based on the evidence presented and on the court's view of the restaurant in operation, the court concludes that the tray test is a legitimate indicator of an individual's ability to perform an essential component of a food server's job at Joe's.

### D. Joe's Reputation in the Server Community

13. There was a widely-held belief among workers in the Miami food serving industry that Joe's would not hire women for food server positions. One witness testified, "Joe's had a reputation of being one of the best restaurant jobs to get if you were a man. As far as being a woman, you need not apply." Another said, "It was like common knowledge that they didn't hire women at the time." From this and other testimony in the record, the court finds that Joe's historical practice of not hiring women as food servers resulted in the commensurate reputation. This reputation caused many eligible female food servers not to attend the annual roll call, considering it a waste of time. This is a significant finding, for Joe's argued at trial that it did not discriminate against women because it hired from an open applicant pool and women simply did not apply. The EEOC agreed that women rarely attended roll calls, but contended this was due to Joe's historical practice and resulting reputation for not hiring female food servers. The court concludes that the EEOC's analysis is correct.

## E. Applicant Flow Data

14. Joe's historical practice of not hiring female food servers is statistically demonstrated by comparison to the number of women available for these jobs. Such a comparison is referred to as an "applicant flow data analysis." In other words, information about who applied—"applicant flow data"—is compared with data reflecting who was hired. In a free and open market, applicant flow data should reflect the relevant labor pool i.e., available people who want and are qualified for the job. Therefore, most analysts agree that applicant flow data should be used unless it is incomplete or unreliable.

15. At trial, there was a conflict between the parties' experts as to whether Joe's applicant flow data is complete and reliable. Ms. Elvira Sisolak, an EEOC labor economist, opined that Joe's applicant flow data is skewed and, therefore, unusable. She testified that if eligible female food servers did not apply for positions at Joe's because of the restaurant's reputation for not hiring women, then the available data does not provide an accurate estimate of the number of qualified female food servers interested in these positions. Dr. James T. McClave, the restaurant's expert in statistics, disagreed, contending that the applicant flow data is accurate and demonstrates that Joe's hired women commensurate to the percentage of women who applied. Based on the court's earlier finding that Joe's reputation caused eligible women to self-select out, the court concludes that Ms. Sisolak's approach is more appropriate.

16. Because applicant flow changed substantially after the EEOC filed its charge, there are two relevant time frames for this analysis: the pre-charge period (October 1986–June 1991) and the post-charge period (July 1991–December 1995). The parties agree that the only applicant flow data available for the pre-charge period is an estimate that perhaps 3% of applicants were women. Actual applicant flow data is available for the post-charge period. On average, 22.02% of applicants for server positions at Joe's in the post-charge period were women:

| Season | Women applicants | Women hired |
|---|---|---|
| 1991–92 | 15.1% | 20.0% |
| 1992–93 | 21.9% | 22.7% |
| 1993–94 | 23.0% | 10.5% |
| 1994–95 | 26.8% | 35.3% |
| Oct.—Dec.1995 | 23.3% | 20.0% |
| Average | 22.02% | 21.7% |

17. The flow data based upon actual applicants, both for the pre-charge and for the post-charge period, is unreliable because it is skewed. Female hiring rates at other area restaurants, for example, suggest an available female labor pool much larger than Joe's applicant pool of 22.02%. One neighboring restaurant, the Rusty Pelican, had a wait staff in 1991 that was 35.9% female; during the comparable period, another nearby restaurant, the 94th Aerosquadron, had a wait staff that was 42.1% female; and the Southpointe Seafood restaurant had a wait staff that was 29.5% female. The plaintiff's expert, Ms. Sisolak, testified that the disparity between these availability figures and both Joe's pre-charge applicant rate of 3% and post-charge applicant rate of 22.02% is significant and cannot have occurred by mere chance. Her testimony is bolstered by witnesses who reported hearing rumors in the summer of 1991 that Joe's would be hiring women in response to charges of discrimination brought by the "Labor Board." The publicity generated by the EEOC's charges apparently increased the number of women applicants to Joe's during the post-charge period. The court finds the testimony on this point to be credible, and accepts Ms. Sisolak's conclusion that the applicant flow data is unusable due to the skewed applicant pool from which it is derived. In reaching this conclusion, the court had the benefit of observing the demeanor of both experts, listening to their testimony, and studying their reports.

## F. Alternative Applicant Pool Data

18. Having found the proportion of actual female applicants to be skewed, the court must select alternate data. Ms. Sisolak proposed that 1990 census data be used which, she said, showed that 44.1% of the eligible labor pool was female. This percentage included all female food servers living and/or working in Miami Beach, including cocktail and buffet servers. The defendant's expert, Dr. McClave, contended that the

44.1% figure included servers not qualified to work at Joe's. He contended that the figure had to be refined to include only qualified servers, and proposed doing so by using past earning capacity as a proxy for experience, and, by extension, experience as a proxy for qualification. Using this method and including only the $25,000–$49,000 income bracket of the census data, Dr. McClave arrived at a refined applicant availability pool of 31.9% women. The salary level used is that of an experienced server at Joe's, that is, a waiter in at least his second season who has obtained a full dinner schedule. To the extent Dr. McClave errs in this refinement, he does so only modestly by omitting, for instance, persons in the same earnings category as a first year server at Joe's. As a means of defining a reliable applicant pool, however, the court finds Dr. McClave's approach to be the more accurate because it accords with the extensive testimony about Joe's method of operation, i.e., the manner in and pace at which food is delivered to the tables. Also, the court considered the evidence gained during its view of the operating restaurant. In light of this testimony and evidence, the court accepts Dr. McClave's approach and finds that at all relevant times, 31.9% of the available labor pool has been female.

Based upon the foregoing findings, the court reaches the following

### CONCLUSIONS OF LAW

The EEOC argued alternately under the theory of disparate treatment, based on direct and circumstantial evidence, and under the theory of disparate impact, based on statistical evidence. The court finds that the EEOC has not met its burden of proof under disparate treatment analysis. However, the EEOC has met its burden of proof under the disparate impact model. Accordingly, the court will address only the disparate impact claim in detail.

■■■ Sex discrimination under the theory of disparate impact occurs when a facially neutral rule or practice of the employer has a disproportionate impact on one sex. *See Griggs v. Duke Power Co.*, 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971). "Under [Title VII], practices, procedures, or tests

neutral on their face, and even neutral in terms of intent, cannot be maintained if they operate to 'freeze' the status quo of prior discriminatory employment practices." *Id.* 401 U.S. at 430, 91 S.Ct. at 853. The premise of disparate impact theory is that some employment practices, adopted without a deliberately discriminatory motive, may be the functional equivalent of intentional discrimination. *Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 987, 108 S.Ct. 2777, 2785, 101 L.Ed.2d 827 (1988). "[G]ood intent or the absence of discriminatory intent does not redeem employment procedures or testing mechanisms that operate as 'built-in headwinds' for minority groups and are unrelated to measuring job capability." *Griggs*, 401 U.S. at 431, 91 S.Ct. at 854. Accordingly, discriminatory intent is not the focus under this model. Rather, disparate impact analysis is directed at furthering "the removal of artificial, arbitrary, and unnecessary barriers to employment when the barriers operate invidiously to discriminate on the basis of racial or other impermissible classification." *Id.*, 401 U.S. at 431–32, 91 S.Ct. at 853. Sex is such an impermissible classification under Title VII. 42 U.S.C. § 2000e–2(a).

■■■ To establish a prima facie case of disparate impact sex discrimination, the plaintiff must show that a facially neutral practice of the employer has a disproportionate impact on one sex. Thus, the plaintiff must: (1) allege that there is a disparity between the proportion of women in the available labor pool and the proportion of women hired; (2) identify the specific employment practice alleged to cause such disparity; and (3) show the causal nexus between that employment practice and the disparity. *Watson*, 487 U.S. at 994, 108 S.Ct. at 2788; *Wards Cove Packing Co. v. Atonio*, 490 U.S. 642, 656–58, 109 S.Ct. 2115, 2124–25, 104 L.Ed.2d 733 (1989). Once the plaintiff has made a prima facie case, the burden of production shifts to the defendant to show that the challenged practice serves a legitimate business goal. If the defendant does so, the plaintiff bears the ultimate burden of proving that an alternative, non-discriminatory practice would have served the stated goal just as well.

The plaintiff prevails if it demonstrates that the defendant did not adopt an available alternative and that, therefore, the discriminatory practice was unjustified.

■ Before the court proceeds to the prima facie case, a threshold issue requires discussion. In the preceding findings, the court held that Joe's reputation in the community, which reflected the restaurant's historical hiring practice, led potential female applicants not to apply for server positions. Joe's reputation, therefore, was largely responsible for the gender skew in the pool of applicants at the annual roll call. It is well-settled that an employer's reputation for discriminatory hiring practices can lead to a self-selected applicant pool not reflective of the actually available labor pool. Quite irrespective of the intentions of the employer, a rational qualified female candidate is likely to self-select out of the application process, declining to make what she considers a "futile gesture." *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 365–66, 97 S.Ct. 1843, 1870, 52 L.Ed.2d 396 (1977); *Mister v. Illinois Cent. Gulf R. Co.*, 832 F.2d 1427, 1435 (7th Cir.1987). Thus, the existence of such a reputation is highly relevant to whether Joe's actual applicant flow data reflects the available labor pool. *See EEOC v. Sheet Metal Workers*, 463 F.Supp. 388, 426 (D.Md.1978) (existence of discriminatory reputation relevant to whether non-applicant would have applied but for that reputation). Put more narrowly, evidence of Joe's reputation in the food serving community was admitted as highly relevant to whether, how, and why would-be applicants were chilled from applying for traditionally male jobs. *United States v. Central Motor Lines, Inc.*, 338 F.Supp. 532, 558–59 (W.D.N.C.1971).

While Joe's vehemently contested the admissibility of this reputation evidence, its objections fall wide of the mark. They presuppose that evidence of Joe's reputation was offered as proof of conduct consistent with the reputation, as proof of Joe's hiring practices themselves, or as proof of bad character or intent to discriminate. None of these is the case. Evidence of Joe's reputation was admitted solely to establish the existence of the reputation, and not for any other purpose.

## A. Statistical Disparity

■ Turning to the first element of its prima facie case, the EEOC must demonstrate a statistical disparity between the proportion of women in the available labor pool and the proportion of women hired. Ms. Sisolak, the plaintiff's expert, performed statistical analyses comparing the number of women actually hired as servers by Joe's to the number of women expected to be hired. In each analysis, Ms. Sisolak ran a binomial probability test, which calculated the probability that the disparity between the figures occurred by chance. She then conducted the normal approximation to the binomial test in order to yield a "z score," or normal standard deviation, indicating that probability. From this result, Ms. Sisolak then reported the minimum rate of women in the labor pool that would result in a statistically significant disparity relative to Joe's hiring rate. Her final step was to see if the percentage of women in Joe's available labor pool exceeded this minimum. If so, then she would conclude that a statistically significant disparity existed. If not, then she would conclude that the disparity was not significant and could be explained by mere chance.

Ms. Sisolak conducted this analysis three times: two of her analyses covered the pre-charge period and the post-charge periods, respectively, and the third analysis covered both periods together, *i.e.*, from October 1986 to December 1995.

For the pre-charge analysis from October 1986 to June 1991, Joe's hired 108 waiters. All were men. According to Ms. Sisolak's analysis, even if the applicant pool had contained only 5% women, let alone the 31.9% estimate that the court has found reliable, mere chance could not explain Joe's failure to hire a single woman. Joe's zero female hiring rate leads inexorably to the conclusion that some discriminatory influence is at work—what the case law terms the "inexorable zero." *See Teamsters*, 431 U.S. at 342 n. 23, 97 S.Ct. at 1858 n. 23 ("[F]ine tuning of statistics could not have obscured the glaring absence of minorit[ies] . . . . [T]he inference

of discrimination came not from a misuse of statistics but from 'the inexorable zero.'").

■ These statistics from the pre-charge period are the most probative of the EEOC's case. Statistics from the post-charge period are usually accorded less weight precisely because a lawsuit may be impending. *O'Brien v. Sky Chefs, Inc.*, 670 F.2d 864, 867 (9th Cir.1982) ("later changes in promotion policies [made after charges were brought] could not erase liability for earlier discrimination") (*citing Teamsters*, 431 U.S. at 341–42, 97 S.Ct. at 1857–58). *See generally* Ramona L. Paetzold & Steven L. Willborn, *The Statistics of Discrimination: Using Statistical Evidence in Discrimination Cases* 4–13 (Shephard's/McGraw–Hill, Inc. 1994) (hereinafter "Paetzold"). "To the extent that post-charge evidence appears more favorable than pre-charge evidence, it may reflect a change in policy following the charge.... The appropriate time frame may properly exclude employer conduct that is favorable to the employer but made in anticipation of litigation." Paetzold at 4–13. However, because Joe's is charged with discrimination from July 1991 through December 1995, the court will analyze the post—charge statistics as well.

■ During the post-charge period from July 1991 until December 1995, Joe's hired eighty-eight waiters, nineteen of whom—or just under 22%—were women. Comparing this hiring rate to the available 31.9% women in the available labor pool led the EEOC's expert, Ms. Sisolak, to calculate a "z score" which ranged from 1.96 to 2.07 standard deviations, or a probability of 0.05. Based on this figure, she concluded that the disparity between the two percentages was statistically significant; *i.e.*, that it did not occur by chance. Generally, the law considers a probability level of 0.05, or a disparity of two standard deviations, sufficient to establish that some non-random discriminatory influence is at work. *See Castaneda v. Partida*, 430 U.S. 482, 496 n. 17, 97 S.Ct. 1272, 1281 n. 17, 51 L.Ed.2d 498 (1977); *Hazelwood School Dist. v. United States*, 433 U.S. 299, 308, 311 nn. 14, 17, 97 S.Ct. 2736, 2742, 2743 nn. 14, 17, 53 L.Ed.2d 768 (1977); *Eastland v. Tennessee Valley Authority*, 704 F.2d 613, 622 n.

12 (11th Cir.1983), *cert. denied*, 465 U.S. 1066, 104 S.Ct. 1415, 79 L.Ed.2d 741 (1984). *But see Stender v. Lucky Stores, Inc.*, 803 F.Supp. 259, 323 n. 22 (N.D.Cal.1992) (cautioning against formulaic application of standard) Viewed against this general legal standard, without more, Ms. Sisolak's z score of 1.96 to 2.07 standard deviations is ambiguous. Without any other consideration, the lower end of the range falls below the legal standard of two standard deviations and supports a conclusion that mere chance accounts for the disparity. On the other hand, the higher end of her range exceeds the legal standard and supports the more damning conclusion that chance does not account for the disparity. These calculations, however, shed their ambiguity when interpreted in light of Joe's knowledge of the EEOC's investigation.

Joe's knew in July of 1991 that the EEOC had commenced its investigation. Still, the restaurant continued with a hiring process that produces a disparity in the hiring of women. In this context, Ms. Sisolak's z score of 1.96 to 2.07 standard deviations is no longer ambiguous. Rather her calculation shows that, although Joe's hiring of women has been improving, its system has not been adequately purged of the influences which affected women so adversely in the pre-charge period. Thus, the court concludes that Joe's hiring continues to exhibit a significant disparity in the post-charge period, although to a lesser degree than in the pre-charge period.

Ms. Sisolak's analysis of the entire ten year period—both pre- and post-charge together—is consistent with her analysis of the two periods separately. In particular, she opined that Joe's hiring of females during the ten year period showed evidence of a disparate impact on women even if only 15% of the available labor pool had been female. Thus, given that the percentage in the available labor pool was actually 31.9%, she found strong evidence of non-random factors which had the effect of excluding women from the food server positions. Accordingly, through all three analyses, the EEOC has satisfied the first element of its prima facie case, and the court turns to the second element.

## B. Challenged Employment Practice

 The second element of the prima facie case requires the identification of the employment practice alleged to be the cause of the disparity. Disparate impact analysis encompasses facially neutral rules or policies as well as employment practices of a subjective or discretionary nature. *Watson,* 487 U.S. at 990–91, 108 S.Ct. at 2786–87. Two or more components of a hiring process may interact to result in a disparate impact. *See Griffin v. Carlin,* 755 F.2d 1516, 1525 (11th Cir.1985); 42 U.S.C. § 2000e–2(k) (if elements of decisionmaking process are not capable of separation for analysis, process may be analyzed as one employment practice). *See also Stender,* 803 F.Supp. at 320 (this formulation is designed to combat subconscious stereotypes and prejudices which might result in discrimination even absent an intentional practice or explicit policy to that effect).

The challenged employment practice in this case is management's undirected and undisciplined delegation of hiring authority to subordinate staff. The Supreme Court in *Watson* noted that delegating "employment decisions to those employees who are most familiar with the jobs to be filled and with the candidates for those jobs" can constitute an employment practice within the meaning of disparate impact theory. *Watson,* 487 U.S. at 990–92, 108 S.Ct. at 2786–87. The Court was careful to point out that such delegation is not by definition unlawful, with the following important caveat:

> It does not follow ... that the particular supervisors to whom this discretion is delegated always act without discriminatory intent. Furthermore, even if one assumed that any such discrimination can be adequately policed through disparate treatment analysis, the problem of subconscious stereotypes and prejudices would remain.... If an employer's *undisciplined system of subjective decisionmaking* has precisely the same effects as a system pervaded by impermissible intentional discrimination, it is difficult to see why Title VII's proscription against discriminatory actions should not apply.

*Id.* (emphasis supplied).

The management of Joe's—without the benefit of policies or guidelines—delegates total and complete discretion to subordinates in hiring food servers. At least for the pre-charge period, management never conveyed its concern about compliance with gender-based civil rights laws. When subordinate staff filled 108 sequential vacancies with male servers, management never raised a question nor voiced an objection. This silence signified approbation. Jo Ann Bass confirmed the absolute nature of this delegation when she testified: "I have nothing to do with hiring or firing. I give an overall view as to something that I see as glaring." Although she always sits in on the annual roll call, Mrs. Bass has never instructed the hiring staff how to select servers and does not set out guiding principles. Thus, the subordinates are left to make decisions according to their own subjective intuition. Moreover, their judgment of what is appropriate is informed largely by their own experience in the restaurant's atmosphere of all-male service.

Not only is the hiring staff's discretion unguided from above, it also lacks the internal discipline necessary to restrain the subjectivity of those charged with this task. The hiring staff uses subjective interviews to evaluate applicants. The criteria used—appearance, attitude, articulation and experience—are not defined or standardized between interviewers. Some criteria, such as appearance and attitude, are by definition subjective and necessarily result in a subjective process overall. As the *Watson* Court explained: "However one might distinguish 'subjective' from 'objective' criteria, it is apparent that selection systems that combine both types would generally have to be considered subjective in nature." *Watson,* 487 U.S. at 989, 108 S.Ct. at 2786.

Indeed, even in as objective a category as experience, no consensus emerges from the testimony of hiring staff as to what constitutes sufficient experience to qualify a candidate. Some believe that prior single service experience—as opposed to team service experience—is required; others do not. Some

candidates with decades of experience are rejected, while others without any experience are hired. For example, Barbara Fitzpatrick, an applicant with twenty years of serving experience, was not thought to merit invitation to even the probationary trailing period, while a male applicant without any prior experience was hired and cited by Roy Garret and Raymond Damiano as being a "one in a million" server. Likewise, hiring staff members differ as to what restaurants are "similar" to Joe's for purposes of experience. Hiring staff members are neither provided with, nor do they develop their own, methodology to ensure that each interviewer evaluates and weighs the four factors in a consistent, objective, and unbiased manner. As a result, Joe's hiring process is unduly vulnerable to improper influences.

With the announcement of the EEOC's investigation, Joe's management—for the first time—voiced its concern that the hiring process should be gender-neutral. In addition, management instituted steps to mitigate subjectivity in the interviewing and rating process by directing the daytime maître d' to conduct interviews in conjunction with another maître d'. This joint interviewing mechanism was subsequently expanded to incorporate a panel of three interviewers, and changed, still later, to include a woman. Thus, in the post-charge period, the management at Joe's took several concrete steps to move toward gender-neutral hiring of servers.

That management's changes improved the process is reflected in the statistics. From July of 1991 onward, Joe's began to hire females as food servers—boosting the proportion of females hired each year from the "inexorable zero" to the 21.9% previously noted. Certainly, Joe's management is to be commended for taking these steps; however, they were not enough to overcome Joe's history of being an all-male server establishment and the corresponding reputation Joe's created.

While management's introduction of a panel system for interviewing may dilute the subjective views of any one evaluator, it does not overcome management's failure to develop uniform, gender-neutral guidelines to en-

sure that all interviewers interpret criteria in the same manner and apply them consistently. Even though management also began to voice its concern about a gender-neutral hiring process, it has not otherwise restructured its broad delegation of hiring authority. Most importantly, it has not taken the reasonable steps necessary to counteract its reputation as a restaurant that does not hire women. As a result, the lack of managerial oversight and lack of standardization that characterized the pre-charge period also persist into the post-charge period.

## C. Causal Connection

 Having shown a disparity in the hiring of women and an employment practice which could account for the disparity, the remainder of the EEOC's case becomes one of causation. That is, does Joe's undirected and undisciplined delegation of hiring authority cause the disparity between the number of women hired as servers and the number of women available, or are forces outside the hiring process—such as a deteriorating neighborhood, low turnover, or the heavy lifting required of servers—to blame? To prevail on this question, the EEOC must provide statistical evidence "of a kind and degree sufficient to show that the practice in question has caused the exclusion of applicants for jobs and promotions because of their membership in a protected group." *Watson*, 487 U.S. at 994, 108 S.Ct. at 2789. The disparity must be so substantial that it raises an inference of causation. *Id.; see Albemarle Paper Co. v. Moody*, 422 U.S. 405, 425, 95 S.Ct. 2362, 2375, 45 L.Ed.2d 280 (1975).

Certainly the statistics presented in this case, most notably the statistics for the five year pre-charge period during which not one female food server was hired, are substantial and persuasive. They support the inference that the restaurant's uncircumscribed delegation of hiring caused the disproportionate exclusion of women from server positions. Even substantial statistics, however, do not suffice when standing alone. The Supreme Court has cautioned that "their usefulness depends on all of the surrounding facts and circumstances." *Teamsters*, 431 U.S. at 339–40, 97 S.Ct. at 1856 (where "cold numbers"

were brought to life only by additional testimony). That is, the circumstances of the case must lead to the conclusion that the hiring practice in fact caused the disparities. Justice Holmes once said, "a page of history is worth a volume of logic." *New York Trust Co. v. Eisner,* 256 U.S. 345, 349, 41 S.Ct. 506, 507, 65 L.Ed. 963 (1921). So too in this case, a paragraph of historical context is worth a volume of statistics.

As the court detailed in its findings of fact, Joe's has been a "male server type" establishment for the better part of this century. While women have predominated among Joe's owner/managers, as well as among the laundry, cashiering, and take away staff, women have systematically been excluded from the most lucrative entry level position, that of server. So accepted was this practice that Joe's general manager, Robert Moorehead, candidly admitted that it never occurred to him that something might be wrong when 108 positions were filled sequentially with male applicants between 1986 and 1990. Many witnesses testified that, as a result of this known practice, Joe's created a reputation for not hiring women servers and thereby induced qualified women to self-select out of the applicant pool at roll call. As a result, the roll call became skewed and remains skewed to the present day.

By failing to address its entrenched reputation and the resulting effect on the roll call, Joe's leaves undisturbed a significant factor causing the ongoing exclusion of women from server positions. Unless and until Joe's takes reasonable steps to confront the reputation it has created, it will continue to experience skewed applicant pools at its annual roll call. Furthermore, without additional guidance and structuring by management, there is no assurance that female applicants who attend roll call will be treated evenhandedly. This persistent legacy provides the causative link. It explains how Joe's unguided and undisciplined delegation of hiring authority continues on and produces the harm of a disparate impact in the hiring of female food servers. With this proof, the EEOC completes its prima facie case.

## D. Legitimate Non–Discriminatory Reasons and Possible Alternatives

█ To rebut the EEOC's prima facie case Joe's put on evidence suggesting that it had "legitimate, non-discriminatory reasons" for the employment practice in question. *See Watson,* 487 U.S. at 986, 108 S.Ct. at 2784. Such reasons, if sufficient, may defeat the EEOC's case unless the EEOC adequately establishes that an alternative practice is available which would achieve the same business end without the undesirable effect on minorities. *Wards Cove,* 490 U.S. at 661, 109 S.Ct. at 2126–27; *Watson,* 487 U.S. at 998, 108 S.Ct. at 2790–91; 42 U.S.C. § 2000e–2(k). Under the law, the availability of alternative non-discriminatory practices undermines the legitimacy of any employment practice which has a disparate impact on women. *Albemarle Paper Co.,* 422 U.S. at 425, 95 S.Ct. at 2375.

█ In this case, the evidence of Joe's legitimate reasons for its practice centers on the simplicity of the roll call. It is cost-effective and efficient, providing an ample supply of qualified, albeit predominantly male, applicants. The roll call requires *de minimis* expenditures for recruitment and little investment of time in screening. Furthermore, the delegation of hiring to the daytime maître d' frees senior management for other tasks during the hectic season opening. However, even assuming for the sake of argument that these reasons satisfy Joe's burden of production on rebuttal, they are overcome by the availability of equally effective, non-discriminatory alternative practices which are also in evidence.

To be sufficient, a proposed alternative must be commensurate with the defendant's chosen practice in achieving legitimate employment goals, such as the "employer's legitimate interest in efficient and trustworthy workmanship." *Dothard v. Rawlinson,* 433 U.S. 321, 329, 97 S.Ct. 2720, 2727, 53 L.Ed.2d 786 (1977). Increased cost and other burdens imposed by an alternative practice must be considered in making this determination. *Wards Cove,* 490 U.S. at 661, 109 S.Ct. at 2127. While the court need not decide everything that Joe's should have done to avoid

liability under Title VII, the evidence reflects that Joe's had a range of salient alternatives to its current practices which could have been used to offset the subjectivity of its hiring and the reputation it had made for itself through its history of all-male hiring.

First, Joe's management could have established firmer definitions for the four criteria it uses to evaluate applicants. Joe's could have standardized the application of these criteria across the members of its hiring panel. Each of these measures would better address the subjectivity which still lurks so harmfully in Joe's hiring process. And the measures could do so without in any way impairing the other benefits of the roll call system that Joe's finds so cost-effective.

Second, there is abundant testimony in the record that Joe's is an institution which receives frequent publicity in the local media. Management could have used these existing channels of publicity to clarify its commitment to being an equal opportunity employer. In other words, Joe's had public opportunities to repudiate its reputation for hiring only males. That such publicity is effective is demonstrated by the jump in the proportion of female applicants and female hirees at Joe's in the wake of the publicity surrounding the announcement of the EEOC's investigation.

Third, Joe's asserted at trial that from time to time it places hiring advertisements in the local newspapers. Any of these advertisements could have included the statement that Joe's is an equal opportunity employer. Such a statement would have imposed negligible additional cost on Joe's. Yet, it too would have been another way to offset Joe's reputation that was so long in the making.

Fourth, Joe's could have used the roll call itself to spread the word of its openness to female servers. The same grapevine that Joe's relies upon to attract people to the annual roll call and which induces women to self-select out of the process could have been turned around to bring Joe's into compliance with federal law. For example, at the roll call, when Jo Ann Bass told everyone "the kind of place we are," she could also have announced, "We are an equal opportunity employer." Incumbent servers could have been told this same message at the close of the season, in anticipation of spreading the word prior to the following fall's hiring.

All of these mechanisms could have been used by management to convert Joe's hiring system into a gender-neutral one, had management so chosen. Thus, even assuming that Joe's hiring process served a "legitimate employment goal" within the meaning of the law, the identical process with cost-free adjustments could have achieved the same goals without resulting in an adverse disproportionate impact on women. However, Joe's failed to make the available adjustments. Accordingly, the EEOC's prima facie case stands unrebutted.

### E. Summary

The evidence proves that Joe's undirected and undisciplined delegation of hiring authority has a disparate impact on women interested in server positions at the restaurant. While Joe's has never hung a "Males Only" sign on its door, nor had an explicit policy of hiring only male servers, its facially neutral hiring practices operate to, exclude women and perpetuate the restaurant's male server tradition. Title VII expressly forbids practices resulting in an unjustifiable disparate impact on women, including practices simply carried on from pre–Title VII days. Accordingly, having found an illegal disproportionate impact which is traceable to Joe's employment practices, the court finds Joe's guilty of violating Title VII from October 1986 through December 1995.

### DECRETAL PROVISIONS

For the foregoing reasons, it is hereby

**ORDERED** and **ADJUDGED** as follows:

(1) Partial final judgment shall be entered in favor of the plaintiff, the Equal Employment Opportunity Commission, and against the defendant, Joe's Stone Crab, Inc.

(2) This court reserves jurisdiction to conduct a bifurcated trial on damages and other affirmative and injunctive relief at a future setting.