Dempsey J. MARKEY, etc., Plaintiff-Appellant,

v.

TENNECO OIL COMPANY, Defendant-Appellee.

No. 77-3293.

United States Court of Appeals, Fifth Circuit.

Jan. 30, 1981.

Joseph W. Thomas, Okla Jones, II, Ronald C. Davis, New Orleans, La., for plaintiff–appellant.

Andrew P. Carter, David Walker, Alvin J. Bordelon, Jr., New Orleans, La., for defendant–appellee.

1. When a plaintiff asserts a claim under 42 U.S.C. § 1981 in tandem with his claim under Title VII, the elements of the § 1981 claim are essentially identical to the elements of the Title VII claim, *Whiting v. Jackson State University*, 616 F.2d 116, 121 (5th Cir. 1980); *Garcia v. Gloor*, 609 F.2d 156, 164 (5th Cir. 1980); *Blum v. Gulf Oil Corp.*, 597 F.2d 936, 938 (5th Cir. 1979), although an action under § 1981 also requires a showing of discriminatory intent,

Before THORNBERRY, GEE and REAVLEY, Circuit Judges.

THORNBERRY, Circuit Judge:

Dempsey J. Markey filed this class action against the Tenneco Oil Company for alleged violations of Title VII of the Civil Rights Act of 1964, § 701 et seq., 42 U.S.C. § 2000e et seq., and the Civil Rights Act of 1866, 42 U.S.C. § 1981.[1] Markey, a black, complained that he was fired from his job as a laborer at the Tenneco refinery in Chalmette, Louisiana, because of his race. He also contended that the refinery discriminated against blacks in its hiring, discharge, promotion, and pay employment practices. After a nonjury trial on the merits, the district court entered a judgment in favor of Tenneco, narrowing the size of the class, and dismissing the suit as to both Markey and the class.

Although discrimination is a question of fact, it is also the ultimate issue for resolution in this case, and we therefore must independently determine the merits of Markey's claim. *Crawford v. Western Electric Co.*, 614 F.2d 1300, 1311 (5th Cir. 1980); *Burdine v. Texas Dept. of Community Affairs*, 608 F.2d 563, 566 (5th Cir. 1979). We must also examine the record to determine whether the ultimate finding is based on requisite subsidiary facts. *Crawford*, 615 F.2d at 1311; *East v. Romine, Inc.*, 518 F.2d 332, 339 (5th Cir. 1975). We are, however, bound by findings of subsidiary facts that are not clearly erroneous. *East*, 518 F.2d at 339.

*Crawford v. Western Elec. Co.*, 614 F.2d 1300, 1309 (5th Cir. 1980). Thus the facts here precluding recovery under Title VII also preclude recovery under § 1981. *See New York City Transit Authority v. Beazer*, 440 U.S. 568, 583 n.24, 99 S.Ct. 1355, 1364 n.24, 59 L.Ed.2d 587 (1979) ("Although the exact application of [§ 1981] has not been decided by this court, it seems clear that it affords no greater substantive protection than Title VII.")

We have reviewed the record, and in particular we have carefully considered the expert testimony offered by both sides, the statistical evidence in support of that testimony, and the arguments of counsel on appeal. On the basis of the district court opinion, 439 F.Supp. 219, we affirm the judgment in favor of Tenneco on the discharge, promotion, and pay issues, and uphold the decision to narrow the scope of the plaintiff class. For the reasons that follow, we remand for further findings as to the relevant labor market and a determination, based on those findings, whether Tenneco has engaged in a pattern or practice of discrimination in hiring.

■ To make out a prima facie case of pattern or practice of discrimination in violation of Title VII, a plaintiff initially need only show

> a significant statistical disparity between the racial, sexual, or ethnic balance and composition of an employer's work force and that of the community from which the workers are hired. . . .
>
> Once this prima facie case has been established, the employer may introduce evidence to attempt to rebut the inference raised by the figures.

*Falcon v. General Telephone Co.*, 626 F.2d 369, 380–81 (5th Cir. 1980), *quoting United States v. City of Alexandria*, 614 F.2d 1358, 1364 (5th Cir. 1980). Thus, the proper identification of the relevant labor market is particularly important, and may often determine whether a plaintiff has established a prima facie case. *See, e. g., Hazelwood School District v. United States*, 433 U.S. 299, 310–11, 97 S.Ct. 2736, 2743, 53 L.Ed.2d 768 (1977). The Supreme Court in *Hazelwood* recognized that because statistics come in infinite variety, and because their value depends on all of the surrounding facts and circumstances, only the trial court is in a position to determine the appropriate comparative figures. *Id.* at 311–12, 97 S.Ct. at 2743–44. We therefore afford the trial court a great deal of discretion in determining the relevant labor market.

■ Markey tried to establish a prima facie case of discriminatory hiring practices by showing a significant statistical disparity between the proportion of black laborers hired each year by Tenneco and the proportion of black laborers in the labor market. He used the New Orleans Standard Metropolitan Statistical Area (SMSA) as the relevant labor market, since Tenneco attracted employees from each of the parishes in the SMSA. The percentage of unskilled black laborers in the SMSA, according to the 1970 census, was 59.7%. As Markey points out, this approach is consistent with that approved by this court and others in Title VII cases. *See, e. g., International Brotherhood of Teamsters v. United States*, 431 U.S. 333, 337 n.17, 97 S.Ct. 1843, 1855 n.17, 52 L.Ed.2d 396 (1977); *Fisher v. Proctor & Gamble Mfg. Co.*, 613 F.2d 527, 535 n.8 (5th Cir. 1980); *Donnell v. General Motors Corp.*, 576 F.2d 1292, 1296 n.5 (8th Cir. 1978).

The district court, however, rejected use of the entire SMSA and concluded that the relevant labor market in this case should be determined by looking at the parishes where current employees of the plant lived when they were hired. The court assigned a statistical weight to the percentage of blacks in each parish in proportion to the percentage of bargaining unit employees who lived in that parish when hired. Of the employees working in bargaining unit jobs on the date of trial, 63.5% lived in St. Bernard Parish when hired, 20% in Orleans Parish, 5% in Plaquemines Parish, and 2.5% in Jefferson Parish. The court noted the following proportions of blacks in the civilian labor force in each parish: 4% in St. Bernard, 39% in Orleans, 11% in Jefferson, and 16% in Plaquemines. With these figures, the district court reasoned that 4% of the employees who lived in St. Bernard when hired should be black, as well as 39% of those living in Orleans when hired, 11% of those living in Jefferson when hired, and 16% of those living in Plaquemines when hired. According to the district court, this resulted in a relevant labor market of

14.53% blacks in the civilian population.[2] Using other census data, the court further concluded that in the relevant labor market, 32.61% of the laborers were black.[3]

We think the district court erred in calculating the relevant labor market in this manner, for the simple reason that the areas from which an employer actually draws his employees are not necessarily the areas from which we might reasonably expect him to draw them. The trial court's approach would permit an employer to limit the number of blacks in his employ merely by recruiting and hiring from predominantly white areas.[4] Because the district court premised his finding that Tenneco did not engage in discriminatory hiring practices[5]

on this improper market, we reverse and remand on this issue.

We recognize and share the district court's concern that the SMSA may not accurately reflect the labor market actually available to Tenneco. The SMSA approach, for example, may give equal weight to areas far from the plant in which significant numbers of workers may never even contemplate working for Tenneco. We cannot tell from the record whether the SMSA encompasses geographical areas from which job applicants are unlikely to come. We think it would be within the trial court's discretion on remand to modify its approach and assign a statistical weight to the percentage of blacks in each parish based on

2. The court constructed the following table to show how it reached this result:

| Parish | Residence of Employees When Hired, Defendant Exhibit 13 | | Black Population in Parish Civilian Labor Force | | Contribution To Tenneco Relevant Labor Market |
|---|---|---|---|---|---|
| St. Bernard | 63.5% | × | 4% | = | 2.54% |
| Orleans | 28% | × | 39% | = | 10.92% |
| Plaquemines | 5% | × | 16% | = | .80% |
| Jefferson | 2.5% | × | 11% | = | .27% |
| | TOTAL THEORETICAL BLACK POPULATION IN RELEVANT LABOR MARKET | | | | 14.53% |

Record, vol. 2, at 517 n.67.

3. The court constructed this table for black laborers:

| Parish | Residence of Employees When Hired, Defendant Exhibit 13 | | Black Population In Total Parish Laborers | | Contribution To Tenneco Relevant Labor Market |
|---|---|---|---|---|---|
| St. Bernard | 63.5% | × | 15% | = | 9.53% |
| Orleans | 28% | × | 71% | = | 19.88% |
| Plaquemines | 5% | × | 44% | = | 2.20% |
| Jefferson | 2.5% | × | 40% | = | 1.00% |
| | TOTAL THEORETICAL BLACK POPULATION IN RELEVANT LABOR MARKET | | | | 32.61% |

4. We of course make no suggestion that Tenneco has engaged in such a practice.

5. Tenneco hired the following percentages of black laborers in the years 1970–75:

| YEAR | 1970 | 1971 | 1972 | 1973 | 1974 | 1975 |
|---|---|---|---|---|---|---|
| Percentage of Black Laborers Hired | 43.8% | 46.2% | 46.2% | 50.0% | 33.3% | 51.9% |

The court found no statistically significant disparity between these percentages and the 32.61% in what it considered to be the relevant labor market. The court's conclusion may very well have been different had it accepted Markey's use of the SMSA figure, 59.7%.

that parish's contribution to the *applicant* pool. Absent discriminatory recruiting practices, the percentage of applicants from a particular parish may be probative of the willingness of individuals in that parish to travel to the Tenneco plant and of the relative accessibility of the plant to residents of the parish, and thus be a more accurate measure of that parish's contribution to Tenneco's labor pool. The trial court should, of course, consider *any* evidence that helps define the areas from which Tenneco would normally be expected to draw its employees.

In any event, we think it clear that a determination of the appropriate market will depend upon further evaluation by the trial court. We think the parties should have an opportunity to address this issue with greater care and precision. We therefore remand to the district court for further findings as to the relevant labor market area and for an ultimate determination of whether Tenneco has engaged in a pattern or practice of discrimination in hiring.

Markey also attempted to establish a prima facie case of discriminatory promotion practices by showing that the proportion of black craftsmen employed by Tenneco varied significantly from the proportion of black craftsmen in the SMSA. The trial court again rejected Markey's use of the SMSA as the basis for comparison, and constructed its own relevant labor market, from which it concluded that blacks were adequately represented in craftsmen positions. Although the trial court erred in its determination of the relevant labor market, we need not remand on this issue for we agree with the trial court that Tenneco successfully dispelled any inference of discrimination in promotion that might arise from a disparity in the percentages of black craftsmen at Tenneco and in an appropriate labor market.

Finally, Markey claims on appeal that the district court erred in deciding without comment that Tenneco did not discriminate against applicants or candidates for first-line supervisor positions. The district court did not address that claim in its opinion.

We think that because of the recertification of the class this claim was no longer before the court. Tenneco concedes that the question of discrimination in hiring or selecting supervisors remains untouched by this judgment. Brief for Appellee, at 41 n.16.

AFFIRMED in part and REVERSED and REMANDED in part.