PROCTOR & GAMBLE, LIMITED,
Plaintiff-Appellant,

v.

M/T STOLT LLANDAFF, etc., et al.,
Defendants-Appellees.

No. 81–3228
Summary Calendar.

United States Court of Appeals,
Fifth Circuit.

Jan. 4, 1982.

---

Stanley McDermott, III, and Machale A. Miller, New Orleans, La., for plaintiff-appellant.

Harvey G. Gleason, New Orleans, La., for E. T. Radcliffe & Co., Ltd.

M. D. Yager, New Orleans, La., for Parcel Tankers, Inc. & M/T Stolt Llandaff.

Before BROWN, POLITZ and WILLIAMS, Circuit Judges.

JOHN R. BROWN, Circuit Judge:

Proctor & Gamble, Ltd. (P&G) appeals from a District Court decision dismissing its action against a vessel, its owners and charterers. As we find no error in the District Court's careful opinion, we affirm.

P&G chartered the M/T STOLT LLANDAFF to carry a shipment of coconut fatty alcohol (coconut) and tallow fatty alcohol (tallow) from the United States to Rotterdam, The Netherlands. STOLT LLANDAFF (owned by E. T. Radcliffe & Co., Ltd.), which was time chartered to defendant Parcel Tankers, Inc., first loaded up in Richmond, California, and then finished loading in Houston, Texas. The coconut was contained in the vessel's # 4 port tank and the tallow in the # 15 center tank. STOLT LLANDAFF made an apparently uneventful crossing to Europe. Arriving in Rotterdam on May 22, 1976, it docked at jetty number 5 near facilities owned by Nieuwe Matex, B.V., which had leased tank space to P&G.

Nieuwe Matex had designated shore tanks # 1515 and # 1517 to receive the coconut and shore tank # 1505 to receive the tallow. These tanks, located some distance from the berth, were connected to the jetty by means of permanent steel shore lines. Shore line # 008 ran to tank # 1505 and shore line S15 to tanks # 1515 and # 1517.

Each of the vessel's cargo tanks was connected to a flange on either the port or starboard manifold of the vessel, located amidships. The # 4 port tank was connected to a flange on the port manifold, but the # 15 center tank was connected to a flange on the starboard manifold. As the vessel moored port side to the jetty, it proved necessary to discharge the liquids over the port side. The crew therefore rigged a ship's hose to connect the starboard flange to a port flange (the ship's permanent # 4 cross-over line).

Nieuwe Matex alone was responsible for selecting the storage tanks and shore lines. No member of the crew possessed any information about the layout of the shore facilities. It also was responsible for making the connections between the vessel and the shore lines. To accomplish this task, Nieuwe Matex had attached a hose to each of the two shore lines prior to the arrival of STOLT LLANDAFF, one made of rubber and one of stainless steel. A surveyor from Caleb Brett & Son (Continentaal), B.V., P&G's surveyors, rejected the rubber hose and insisted that Nieuwe Matex use stainless steel hoses for both cargoes.

Shortly after STOLT LLANDAFF's arrival, a Nieuwe Matex jetty operator boarded to prepare for unloading. He spoke with the chief mate to ask about connections to the flanges. Their testimony on subsequent events differed. The chief mate claimed that there was a language difficulty and that he had to correct the jetty operator. The jetty operator stated that there was no misunderstanding: the chief mate (erroneously) told him the # 4 port flange was for tallow and the # 15 starboard flange was for coconut. Although the flanges were each marked with a metal plate, the jetty operator said that he labelled the port flange "tallow" and the crossover flange "fatty" in accordance with the chief mate's instructions.

Nieuwe Matex employees attached the stainless steel hoses to the two flanges. The Caleb Brett surveyor tested the contents of each tank to verify that they were correctly labelled. He then ordered the vessel to begin pumping coconut. The chief mate activated the # 4 port tank pump and pumping began at 2025. Pumping of tallow from # 15 starboard tank via the # 4 crossover line followed at 2105.

The jetty operator testified that he believed tallow was to be discharged first, so he opened shore line # 008.

Despite the precautions and extended consultations between the vessel's crew and jetty operators, a mistake occurred. The lines crossed somewhere so that coconut was pumped into the tallow storage tank. It overflowed. What remained was contaminated by the contact with tallow. P&G seeks recompense of $58,316.00 in damages from the vessel, her owner as claimant and in personam, and the charterer of the vessel for alleged negligence in connecting the wrong hose to the flange.

The District Court found that Nieuwe Matex's employees were responsible for the error and the vessel blameless and dismissed the suit. P&G appeals. We affirm.

■ Under the Carriage of Goods by Sea Act (COGSA), 46 U.S.C.A. § 1300 *et seq.*, a vessel's owners and operators "shall properly and carefully load, handle, stow, carry, keep, care for, and discharge the goods carried." § 1303(2). Supplementing the statutory protections, the applicable Bill of Lading provides:

7. PUMPING IN AND OUT, HOSES. (a) The cargo shall be pumped into the Vessel at the expense, risk and peril of the Charterer, and shall be pumped out of the Vessel at the expense of the Vessel, but at the risk and peril of the Vessel only so far as the Vessel's permanent hose connections, where delivery of the cargo shall be taken by the Charterer or consignee. . . .

(b) Hoses for loading and discharging shall be furnished by the Charterer and shall be connected or disconnected by the Charterer, or at the option of the Owner, by the Owner at the Charterer's risk and expense. . . .

STOLT LLANDAFF had a duty of care toward the cargo throughout the voyage, but its responsibility ended when the cargo passed through the permanent flanges *assuming* the chief mate did not incorrectly label the flanges in his conversation with the jetty operator. *Caterpillar Overseas S. A. v. SS EXPEDITOR*, 318 F.2d 720, 1963 A.M.C. 1662 (2nd Cir.), *cert. denied*, 375 U.S. 942, 84 S.Ct. 347, 11 L.Ed.2d 272 (1963); *Centerchem Products, Inc. v. A/S REDERIET ODFJELL*, 1972 A.M.C. 373 (E.D.Va. 1971).

■ The District Court found that the flanges were adequately labeled and that the mistake occurred as a result of Nieuwe Matex personnel's connection of the flexible hoses to the wrong shore manifolds. It implicitly found that the chief mate had not confused the flanges. This finding is a sensible one in the light of the facts contained in the record.

As the shore lines were permanent, only two possibilities exist. Either the hoses were wrongly connected at the shipboard flanges or they were incorrectly connected at the flanges on the dock. The District Judge, after hearing testimony in open court and considering depositions and exhibits, chose to believe STOLT LLAN-

DAFF's version of events. These factual findings may not be disturbed on appeal unless clearly erroneous, *Williamson v. Brown*, 646 F.2d 196 (5th Cir. 1981); *Markey v. Tenneco Oil Co.*, 635 F.2d 497 (5th Cir. 1981); *Johnson v. Uncle Ben's*, 628 F.2d 419 (5th Cir. 1980). The District Court's findings are clearly above that Plimsoll Line.

Dismissal of the suit was proper.

AFFIRMED.