HULL, Circuit Judge,
specially concurring in part and dissenting in part:
After a lengthy bench trial] the' district court, as the fact-finder, entered compre *1288 hensive findings of fact and conclusions of law. EEOC v. Joe’s Stone Crab, Inc., 969 F.Supp. 727, 730-85 (S.D.Fla.1997). The trial evidence amply supports all of the district court’s factual findings, and the majority does not contend otherwise. Thus, I concur in the majority opinion to this extent.
I also agree with the majority that disparate impact liability requires a showing that facially-neutral employment practices caused the lack of female food servers at Joe’s. I disagree, however, with the majority’s conclusion that the district court “identified no facially-neutral practice responsible for the gender disparity in Joe’s food server population and we can find none.” I disagree because the district court (1) did single out certain employment practices that are facially-neutral and (2) did not err in finding that these practices caused the gender disparity in Joe’s food servers. In my view, the district court’s finding of disparate impact liability should be affirmed in full.
Alternatively, even if, as the majority concludes, the district court’s subsidiary factual findings suggest that facially-discriminatory practices at Joe’s actually caused the gender disparity and thus its findings support only disparate treatment liability, we should affirm on that alternate ground. A remand for more work by this trial court is unnecessary. To demonstrate why the liability phase of this protracted case should end here, I discuss first why the district court did not err in finding disparate impact liability, and then why the district court’s subsidiary findings are amply sufficient for us to affirm the district court’s liability decision on the alternate ground of disparate treatment.
I. DISPARATE IMPACT LIABILITY
It is undisputed that from 1950 to 1986, Joe’s hired all male food servers with one exception. The district court identified facially-neutral employment practices by Joe’s that caused this historical gender disparity in its food servers to continue in the pre-charge period — from 1986 to 1990 — and the post-charge period — from 1991 to 1995. The district court even began its conclusions of law by acknowledging that “[t]o establish a prima facie case of disparate impact sex discrimination, the plaintiff must show that a facially neutral practice of the employer has a disproportionate impact on one sex.” Id. at 735 (emphasis added).[1] The district court then correctly stated that, to prove a disparate impact claim, the EEOC: (1) must show a legally significant statistical “disparity between the proportion of women in the available labor pool and the proportion of women hired”; (2) must “identify the specific employment practice alleged to cause such disparity”; and (3) must “show the causal nexus between that employment practice and the disparity.” Id.[2]
The district court also correctly applied these legal principles to its factual find *1289 ings. The majority opinion' only assumes that the district court properly found that the EEOC demonstrated that the required gender disparity between the available labor pool and Joe’s actual hires. In my view, however, the EEOC clearly proved that the available qualified labor pool of food servers was 31.9% female.[3] Id. at 737. Thus, the proven statistical disparity — between 31.9% and 0% in the pre-charge period and 31.9% and 21.7% in the post-charge period — is legally significant.[4]
Because the ' evidence overwhelmingly showed a legally significant gender disparity in Joe’s food servers, the majority opinion necessarily focuses on the second and third prongs of a prima facie disparate impact case — whether the EEOC and the district court identified facially-neutml employment practices as causing this gender disparity. The majority concludes they did not. I conclude they did.
The main facially-neutral employment practice identified by the district court was management’s lack of any hiring guidelines and policies and the resultant “undirected and undisciplined delegation of hiring authority to subordinate staff.”[5] Id. at *1290 738. Within the ambit of “undirected and undisciplined delegation of hiring authority to subordinate staff,” the district court included these facially-neutral practices: (I) management’s lack of any written or even oral guidelines for its staff to follow in hiring; (2) the staffs use of mainly a subjective interview process and “subjective intuition” for hiring its servers; (8) management’s sitting in on the roll call process but providing no input; and (4) lack of any managerial oversight and lack of any standardization, as exemplified by management’s failure to raise a question when the subordinate staff filled 108 consecutive vacancies with only male servers. Id. at 738-39. The majority states that “the subjective hiring criteria did not harm women once they entered the application process.” I disagree because the record evidence supports the district court’s findings that it did. Many qualified women attended Joe’s roll calls and were interviewed, but were not hired.[6]
The district court emphasized that the subjective criteria that Joe’s hiring staff used, and the majority focuses on — appearance, attitude, articulation, and experience — were not defined in any way or standardized between interviewers. Id. at 738. For example, the district court found that the criteria of experience was not defined by management and varied among staff interviewers based upon their subjective beliefs about what constituted experience. The district court also found that some of Joe’s hiring staff believed that prior single service experience — as opposed to team service experience — is required; others did not. As a result, the district court found that some female candidates with decades of experience were rejected by Joe’s staff, while other males without any experience were hired. Id. at 739.[7] Likewise, the district court found that Joe’s hiring staff differed as to what restaurants are “similar” to Joe’s for purposes of experience. Id.
The district court also observed that after the EEOC’s charge, Joe’s management directed the daytime maitre d’ to interview with another maitre d’ and subsequently used a panel of three interviewers, later changed to include a woman. The district court found, however, that “[wjhile management’s introduction of a *1291 panel system for interviewing may dilute the subjective views' of any one evaluator, it does not overcome management’s failure to develop uniform, gender-neutral guidelines to ensure that all interviewers interpret criteria in the same manner and apply them consistently.” Id. The district court summarized Joe’s hiring decisions as being left to each interviewer’s “own subjective intuition” and the interviewers’ judgment being “informed largely by their own experience in. the restaurant’s atmosphere of all-male service.” Id. at 738.
Another major employment practice at Joe’s, which the district court identified as causing the gender disparity, was Joe’s use of only a “word-of-mouth” roll call system for recruiting new servers. The district court pointed out that year after year only a few women came to the roll call due to Joe’s well-known historical practice of hiring, and using, only tuxedo-clad men as servers. The district court emphasized that Joe’s did not advertise in the newspaper or elsewhere that it was an equal opportunity employer or that Joe’s hired both men and women as servers. Instead, Joe’s continued recruiting through only the “word-of-mouth” roll call on the first Tuesday in October — just as it had done for decades.
The majority stresses that the particular date of the roll call was widely known in the Miami Beach community, and that no woman testified that she failed to apply because she was unaware of the roll call. However, the district court found that Joe’s historical practice of hiring only men as servers was also well known in that community and caused women servers to self-select out and not come to Joe’s roll call. Joe’s own conduct caused the dearth of women applicants. The district court, in effect, found women refrained from making the futile gesture of attending the roll call when they knew Joe’s hired only men as servers.
Although the undisciplined delegation of hiring, subjective interview process, and-the use of a roll call are facially-neutral employment practices, the district court also referenced “Joe’s history of being an all-male server establishment.” Id. at 739. Excluding women as servers — -even if to create a fine dining ambience of tuxedo-clad men — is ’ a facially-discriminatory practice, as the majority note's. However, Joe’s past discriminatory hiring is part of the factual background against which the district court analyzed whether 'the -above facially-neutral practices caused the gender disparity to continue. -The district court’s order raised the precise question of whether “Joe’s undirected and undisciplined delegation of hiring authority cause[d] the disparity between the number of women hired as servers' and the number of women available, or are forces outside the hiring process — such as -a deteriorating neighborhood, low turnover, or the heavy lifting required of servers — to blame?” Id.[8]
In short, the district court considered the above facially-neutral employment practices, not in a vacuum, but in the context of Joe’s historical discriminatory practice of excluding women as food servers. The district court properly considered Joe’s historical discriminatory practices, and the “males-only” reputation Joe’s created for itself, as relevant background evidence in examining whether Joe’s facially-neutral employment practices caused and continued the gender disparity in Joe’s food servers. In doing so, the district court did not err because it is well *1292 settled that past discrimination is admissible to demonstrate that facially-neutral employment practices continue to perpetuate the effects of past discrimination.[9]
Against this historical backdrop, then, the district court found that management’s continued unguided and undisciplined delegation of hiring authority, without any written or verbal policies or guidelines, allowed Joe’s subordinate staff (a) to recruit servers by using only its “word-of-mouth” roll call system even though that system had proved to recruit mostly male applicants, and (b) to continue to hire only males as food servers based on their “gut feelings” regardless of the qualified women who did apply. In this manner, the facially-neutral practices caused the gender disparity. The district court further described how Joe’s delegation of hiring authority to staff without any guidelines, and the use of solely the “word-of-mouth” roll call, actually caused the statistical disparity, as follows:
When subordinate staff filled 108 sequential vacancies with male servers, management never raised a question nor voiced an objection. This silence signified approbation. Jo Ann Bass confirmed the absolute nature of this delegation when she testified: “I have nothing to do with hiring or firing. I give an overall view as to something that I see as glaring.” Although she always sits in on the annual roll call, Mrs. Bass has never instructed the hiring staff how to select servers and does not set out guiding principles., Thus, the subordinates are left to make decisions according to their own subjective intuition. Moreover, their judgment of what is appropriate is informed largely by their own experience in the restaurant’s atmosphere of all-male service.
Id. at 738.
Additionally, the district court correctly found that Joe’s facially-neutral recruiting and hiring practices did not address the entrenched “male-only” hiring and “male-only” reputation Joe’s created for itself and thereby further caused the gender disparity to continue. The district court found that, at a minimum, Joe’s needed to advertise that it now hired both men and women as servers. Instead, Joe’s continued reliance on the facially-neutral, “word-of-mouth” roll call caused the gender disparity in its applicant pool and, in turn, its hires, to continue. Furthermore, as to the women who did apply, the district court found that “without additional guidance and structuring by management, there is no assurance that female applicants who [do] attend roll call will be treated evenhandedly.” Id. at 740.
The district court’s findings are akin to those in Griggs and other cases in which neutral employment practices have been found to perpetuate historical discrimination. Griggs v. Duke Power Co., 401 U.S. 424, 430, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971) (making clear that Title VII prohibited an employer from using neutral hiring and promotion practices to “freeze” in place a status quo achieved through prior decades of intentional discrimination); Senter v. General Motors Corp., 532 F.2d 511 (6th Cir.1976); Rowe v. General Motors Corp., 457 F.2d 348 (5th Cir.1972).[10] *1293 In situations where a protected group has been historically and systematically frozen out of certain employment positions, a purely subjective recruiting and hiring system can act to perpetuate that problem.
As in Rowe, Joe’s had a historical practice of excluding a protected group. Nor was any direction given to Joe’s hiring staff or potential applicants that an effort was being made to change its longstanding historical practice of excluding women as food servers. Indeed, just the opposite occurred. Joe’s hired 108 male servers between 1986 and 1990 but no women, without management voicing an objection to its staff. Further, the hiring staff continued to use only the “word-of-mouth” roll call for recruiting without objection, and was given little to no guidance in terms of how to assess even those female applicants who did apply. As a result, Joe’s staff admittedly relied upon vague “gut feelings.” The staff themselves testified that they viewed Joe’s as a place for male servers.[11] Without guidance from their superiors, this stereotype undoubtedly guided their “gut” feelings as to whom to hire. .
Because Joe’s delegated authority over both recruiting and hiring to staff who admittedly felt that the restaurant was a male-server type of establishment and had historically known it to be so, Joe’s staff was content to hire only men and to use a “word-of-mouth” roll call system which recruited mostly men. Further, the interviewers’ admitted bias for male servers went unchecked by guidance from management.[12] Given the historical context, the district court did not err in finding that management’s continued lack of any guidance to its hiring staff, the staffs continued use of only the “word-of-mouth” roll call, and the use of a subjective interview process caused the gender disparity to continue in both the attendance at the roll call, from which Joe’s hired exclusively, and in the actual hires.
Thus, I conclude that the district court’s findings — that Joe’s specific facially-neutral recruiting and hiring practices caused the gender disparity in its serving staff— are not clearly erroneous.[13]
*1294 II. DISPARATE TREATMENT
Alternatively, even if, as the majority concludes, the district court’s subsidiary factual findings that Joe’s systematically excluded women as food servers show that disparate treatment analysis is more appropriate in this case than disparate impact analysis, I would affirm the district court’s liability finding on that basis.
The majority concedes that “some of the district court’s findings of fact can be read to support the alternate conclusion that Joe’s management intentionally excluded women from food-serving positions in order to provide its customers with an ‘Old World,’ fine-dining ambience.” I would go further and hold that the district court’s factual findings actually do support disparate treatment liability. Specifically, the district court found that Joe’s was “traditionally a male place” and was “always a tradition ... that it was a male server type of job,” quoting Maitre d’ Garret’s testimony to this effect:
As I said before, we had very few female applicants over the years. It was sort of a tradition.... It was always tradition from the time I arrived there that it was a male server type of job. And until just recently when we became aware that we had to do other things, ... originally it was traditionally a male place. We always had women that were qualified women .... Traditionally, I mean, it’s just some restaurants, when you walk in, you know there are going to be women waitresses, other restaurants you know it is going to be male waiters.
Joe’s Stone Crab, 969 F.Supp. at 732 (alteration by district court) (emphasis added).[14] The district court also found that Joe’s excluded women as servers because “Joe’s sought to emulate Old World traditions by creating an ambience in which tuxedo-clad men served its distinctive menu.” Id. at 733.[15]
At another point, the district court found that “Joe’s management acquiesced in and gave silent approbation to the notion that male food servers were preferable to female food servers.” Id. at 731. The district court further found that “what pre *1295 vailed at Joe’s, albeit not mandated by written policy or verbal direction, was the ethos that female food servers were not to be hired.” Id. at 732. Later in its factual findings, the district court twice repeated its description of Joe’s hiring as “Joe’s historical practice of not hiring [women].” Id. at 733, 734. In its conclusions of law, the court similarly repeated its factual finding that historically Joe’s was a male-server establishment and systematically excluded women from the server position, as follows:
As the court detailed in its findings of fact, Joe’s has been a “male server type" establishment for the better part of this century. While women have predominated among Joe’s owner/managers, as well as among the laundry, cashiering, and take away staff, women have systematically been excluded from the most lucrative entry level position, that of server.
Id. at 740 (emphasis added).
At trial, Joe’s asserted that it had no women servers because it “hired from an open applicant pool and women simply did not apply.” Id. at 733. The district court expressly rejected Joe’s contention. Instead, the district court found that Joe’s hired only males as servers for half a century because it wanted to emulate the “Old World” tradition of male servers to create an ambience of “fine dining.” The court also specifically found that Joe’s all-male serving staff and its historical hiring practices caused its “male-only” reputation, stating:
[T]he court finds that Joe’s historical practice of not hiring women as food servers resulted in the commensurate reputation. This reputation caused many eligible female food servers not to attend the annual roll call, considering it a waste of time. This is a significant finding, for Joe’s argued at trial that it did not discriminate against women because it hired from an open applicant pool'and women simply did not apply. The EEOC agreed that women rarely attended roll calls, but contended this was due to Joe’s historical practice and resulting reputation for not hiring female food servers. The court concludes that the EEOC’s analysis is correct.[16]
Id. at 733.
In summary, the district court expressly found that Joe’s systematically excluded women as food servers, and that Joe’s longstanding practice of excluding women as servers created its well-known “male-only” reputation. Thus, Joe’s “male-only” hiring practices and “male-only” reputation caused the dearth' of female applicants at its roll call and the lack of female food servers;- As the majority opinion acknowledges, “much of the district court’s findings (as well as the credited record evidence), may be read to support the conclusion that Joe’s employment practices in hiring servers were really permeated with an unlawful intention to discriminate.”
Thus, as the majority opinion appears to concede, the district court’s subsidiary factual findings are sufficient to support disparate treatment liability. As the majority states, “a finding of disparate treatment requires no more than a finding that women were intentionally treated differently by Joe’s because of or on account of their gender.” Furthermore, as the majority states, “[t]o prove the discriminatory intent necessary for a disparate treatment ... claim, a plaintiff need not prove that a defendant harbored some special ‘animus’ or ‘malice’ towards the protected group to which she belongs.” Rather, as the majority observes, “[i]f Joe’s deliberately and systematically excluded women from food server positions based on a sexual stereotype which simply associated ‘fine-dining *1296 ambience’ with all-male food service, it then could be found liable under Title VII for intentional discrimination regardless of whether it also was motivated by ill-will or malice toward women.”
The majority does not go a step further and affirm on the alternate ground of disparate treatment, however, because it is troubled by “an inconsistency” in the district court’s order. As the majority opinion points out, the district court never discusses or analyzes the EEOC’s disparate treatment claim, but instead gives only • the summary legal conclusion that “the EEOC has not proved intentional discrimination” and “has not met its burden of proof under disparate treatment analysis.” Id. at 730, 735. Despite the lack of analysis or discussion, the majority opinion finds that this two-sentence summary legal conclusion creates a “fundamental inconsistency” with the district court’s factual findings, making remand the “wiser choice.”
I would agree were it not for the fact that the district court made such extensive and clear factual findings about Joe’s discriminatory hiring practices. The record evidence overwhelmingly supports those factual findings, and those factual findings clearly support disparate treatment liability. More importantly, any inconsistency created by this two-sentence legal conclusion is easily reconciled from the face of the district court’s order itself. A close analysis of the order reveals that the district court was under the mistaken view that the intentional discrimination necessary for disparate treatment required either (1) an express policy or directive from Joe’s owners to exclude women or (2) some animus, ill-will, or malice toward women.
The district court viewed Joe’s discriminatory practice as one adopted by Joe’s as the by-product of its “fine dining” tradition and therefore not a direct intentional act of discrimination against women. Specifically, in the district court’s view, the hiring of men was due to a desire to emulate a “fine dining” tradition, as opposed to an animus toward, or a written policy excluding, women. As a result, the district court viewed Joe’s practices as causing a disparate impact on women rather than intentional discrimination against women. Id. at 731.
But as the majority aptly states, if Joe’s “excluded women from food server positions based on a sexual stereotype which simply associated ‘fine dining’ ambience with only all-male food service, it then could be found liable under Title VII for intentional discrimination regardless of whether it had such a written policy or was motivated by ill-will or malice.” Since the district court so clearly made repeated findings that this is precisely what occurred at Joe’s, I would affirm on the alternative ground of disparate treatment thus pretermitting any need for remand. As the majority points out, this district court “has labored ... long and diligently” and this “remand in no way obligates the district court to hear additional evidence or argument in the case.” Because the majority “remandfs] to the sound discretion of the district court,” that court may consider whether to simply strike the two sentences the majority finds create a “fundamental inconsistency” and to then reaffirm its decision on the alternate ground that the EEOC proved disparate treatment of female food servers at Joe’s.
Lastly, the majority opinion favors remand because “almost all of the evidence of intentional discrimination came in the form of conflicting witness testimony subject to lengthy cross-examination.” The majority notes that witnesses Evans, Williams, and Mommsen testified that Joe’s management told them that Joe’s did not hire female servers and actively discouraged women from applying, but also notes that Joe’s management witnesses Bass and Moorehead denied doing this. The majority observes that the district court “made no specific findings on the credibility of these witnesses, and did not specifically resolve these credibility conflicts,” and concludes that “we are not in a *1297 position on appellate review to sort through this conflicting witness testimony in regard to plaintiffs intentional discrimination claims.”
I disagree. This analysis ignores that the district court did make clear and extensive factual findings that Joe’s excluded women as food servers in order to emulate an Old World fine dining experience and then cited certain evidence and quoted at length certain admissions in the testimony by Joe’s management witnesses that amply supported those factual findings. The district court was not required in its order to review and make credibility findings regarding each part of the testimony of each witness. Nor is the district court required to detail all of the other extensive trial evidence that supported its factual findings regarding why Joe’s had all male servers. Instead, our job on appeal is to review the entire record evidence in the light most favorable to the EEOC, as we must, and to determine whether that evidence amply supports the extensive factual findings the district court did make. The record evidence clearly does. The findings that the district court actually did make are more than sufficient to support liability on the alternative ground of disparate treatment. Thus, it is unnecessary to remand this case for the district court to resolve further credibility conflicts.
For all of these reasons, I would affirm the district court’s liability decision in this case.

. The district court also properly pointed out that "[t]he premise of disparate impact theory is that some employment practices, adopted without a deliberately discriminatory motive, may be the functional equivalent of intentional discrimination.... Accordingly, discriminatory intent is not the focus under this model.” Id. at 735 (citing Watson v. Fort Worth Bank & Trust, 487 U.S. 977, 987, 108 S.Ct. 2777, 101 L.Ed.2d 827 (1988), and Griggs v. Duke Power Co., 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971)).

. After finding that the EEOC established a prima facie case, the district court correctly determined (a) that the burden of production shifts to the defendant Joe's to show that the challenged employment practices serve a legitimate, non-discriminatoiy business objective, and (b) that even if Joe’s satisfies this burden, the EEOC may still prevail by establishing that an alternative, non-discriminatory practice would have served the defendant’s stated objective equally as well. Id. at 735-36. The district court ultimately held that even if Joe's hiring process serves a legitimate business objective, alternative non-discriminatory practices would have served these objectives equally as well. Id. at 740-41. Because the parties' and majority's main focus in this appeal is the sufficiency of the EEOC's prima facie case, I do not discuss why the district court correctly found that "the *1289 EEOC's prima facie case stands unrebutted.” Id. at 741.

. We review the factual determination of the available qualified labor pool for clear error. See Kilgo v. Bowman Transp., Inc., 789 F.2d 859, 869 (11th Cir.1986) (holding that "the district court’s rejection of Bowman's applicant flow data is not clearly erroneous”). This Court has emphasized that the Supreme Court "has rejected the requirement that a prima facie case of disparate impact must be based on an analysis of the-characteristics of actual applicants.” Id. at 868 (citing Dothard v. Rawlinson, 433 U.S. 321, 330, 97 S.Ct. 2720, 53 L.Ed.2d 786 (1977)); see Hazelwood Sch. Dist. v. United States, 433 U.S. 299, 308 n. 13, 97 S.Ct. 2736, 53 L.Ed.2d 768 (1977); Forehand v. Florida State Hosp., 89 F.3d 1562, 1574 (11th Cir.1996). This Court also has reaffirmed that different types of labor statistics are relevant to determine the available labor pool and that actual-applicant data may not adequately reflect the potential labor pool. See In re Employment Discrimination Litig. Against the State of Ala., 198 F.3d 1305, 1313 (11th Cir.1999) (stating "even actual applicant statistics may 'not adequately reflect the actual potential applicant pool, since otherwise qualified people might be discouraged from applying because of a self-recognized inability to meet the very standards challenged as being discriminatory.' Dothard, 433 U.S. at 330, 97 S.Ct. at 2727; see also Wards Cove, 490 U.S. at 651 n. 7, 109 S.Ct. at 2122 n. 7; Kilgo, 789 F.2d at 868.”). And the Supreme Court has emphasized that the proper approach is to focus on the qualified population in the relevant labor market. See Wards Cove Packing Co. v. Atonio, 490 U.S. 642, 650-51, 109 S.Ct. 2115, 104 L.Ed.2d 733 (1989).
Further, the district court did not err in finding the available qualified labor pool was 31.9% female, and not the 0 to 3% or 21.9% actual applicants as claimed by Joe's. The district court's findings were amply supported by evidence (a) that 30 to 40% of the food servers at nearby Miami restaurants were female, (b) that the 1990 census data showed the available qualified labor pool of servers being 44.1% female, and (c) the testimony of Dr. McClave, Joe’s own expert, who had refined this 44.1% to 31.9% to reflect only experienced food servers in the higher income brackets of Joe's food servers. See Kilgo, 789 F.2d at 869-70 (concluding that the "determination of the relevant labor market in [that case was] essentially a factual inquiry”); Markey v. Tenneco Oil Co., 635 F.2d 497, 499 (5th Cir.1981) (stating that the trial court is afforded a great deal of discretion in determining the relevant labor market). Finally, the waiter or server work force in Dade County, Florida, was 69.6% female. Thus, this 31.9% figure was substantially less and a conservative percentage given the overall evidence.

. The statistical disparity between 0% and 31.9% is stark. And, even when-this 31.9% figure is compared to the 21.7% hiring statistics in the post-charge period, the "standard deviation” is between 1.96 and 2.07, which is a legally significant disparity under the case law. See Watson, 487 U.S. at 995 n. 3, 108 S.Ct. 2777; Maddox v. Claytor, 764 F.2d 1539 (11th Cir.1985); James v. Stockham Valves & Fittings Co., 559 F.2d 310, 325 n. 18 (5th Cir.1977); Rowe v. General Motors Corp., 457 F.2d 348, 349 (5th Cir.1972).

. Joe's did not have any objective guidelines for hiring food servers but utilized only subjective hiring practices. Thus, the EEOC claimed that Joe's subjective hiring practices had a disparate impact on women. The Supreme Court has expressly held that disparate impact analysis may be applied to subjective hiring practices. See Wards Cove Packing Co. v. Atonio, 490 U.S. 642, 648, 109 S.Ct. 2115, *1290 2120, 104 L.Ed.2d 733 (1989) (citing Watson v. Fort Worth Bank & Trust, 487 U.S. 977, 108 S.Ct. 2777, 101 L.Ed.2d 827 (1988)). The Supreme Court has stated that the delegation of hiring decisions can constitute an employment practice under disparate impact theory. See Watson, 487 U.S. at 990-92, 108 S.Ct. 2777.

.For example, Catherine Stratford testified that she moved from New Jersey to Miami Beach to attend Joe's roll call in 1990. After her move, she did not apply because her roommate told her that Joe's did not hire female servers. In 1991, Ms. Stratford applied at Joe's but was not hired. Teresa Ro-manello testified that she was dissuaded from applying in 1987 by Joe's reputation for hiring only male servers. In 1993, however, Romanello applied unsuccessfully. Carol Coyle also testified that she heard that Joe’s did not hire women. After the EEOC charge, Coyle attended the roll call in 1991 but was not hired. Racquel Munoz testified that she would have applied for a server position in 1989 but did not because of Joe’s reputation for not hiring women. After the EEOC charge, Munoz applied unsuccessfully in 1991. In addition, Barbara Mommsen testified that “it was common knowledge that they [Joe’s] didn't hire women at the time” and that "Joe's had a reputation of being one of the best restaurant jobs to get if you were a man. As far as being a woman, you need not apply.”
The above testimony is from the liability trial. At the subsequent damages trial, these witnesses also testified about Joe's 1997 roll call. For example, Stratford applied unsuccessfully in 1997. Romanello went to the first day of the 1997 roll call but left. Thereafter, she went back, was interviewed, but was not hired. The district court entered a damages order on August 12, 1998, and awarded back pay to Stratford from 1990-95, to Coyle from 1991-95, to Romanello from 1989-96, and to Munoz from 1989-96.

.As an example, Barbara Fitzpatrick, an applicant with twenty years of serving experience, was not thought to merit invitation to even the probationary training period, while a male applicant without any prior experience was hired and cited by Joe's Maitre d’s, Roy Garret and Raymond Damiano, as being a "one in a million” server.

. Joe's contends that the fact that during the 1980s, South Beach Miami was a high-crime area explains the low pre-charge applicant numbers. In addition, Joe’s asserts that the area began to be revitalized at almost the same time as the EEOC commenced its investigation, thus accounting for the increase in female applicants during the post-charge period. Joe’s also presented evidence that its server’s job involves carrying extremely heavy trays and a “frantic” pace. Joe’s evidence was countered at trial, however, by the facts (1) that many of Joe’s other staff members were female, (2) that there was security at Joe’s, and (3) that Southpointe Seafood, directly across the street, had a wait staff that was 25% female. Further, the increase in female applicants at Joe’s after 1991 did not correspond to any change in the strenuous nature of the server position.

. See Fisher v. Procter & Gamble Mfg. Co., 613 F.2d 527, 540 n. 25 (5th Cir.1980) (citing United Air Lines, Inc. v. Evans, 431 U.S. 553, 97 S.Ct. 1885, 52 L.Ed.2d 571 (1977), for the proposition that discriminatory acts not made the basis of a timely charge or occurring before the statute was passed may be considered as background evidence regarding a current practice); Jepsen v. Florida Bd. of Regents, 610 F.2d 1379, 1383 (5th Cir.1980) (stating that evidence of pre-Act discrimination is admissible to prove that facially-neutral practices have acted to perpetuate the effects of that past discrimination); see also Walker v. Jefferson County Home, 726 F.2d 1554, 1557 (11th Cir.1984) ("In a disparate impact case, the court clearly may consider evidence of prior discriminatory acts if such evidence is relevant to show independently actionable conduct occurring within the statutory period.").

. In Rowe, a group of black employees challenged the promotion and transfer procedures at an Atlanta General Motors plant on the ground that they had a disparate impact upon blacks. These procedures depended almost entirely upon a favorable recommendation *1293 from an employee’s immediate foreman. In making these recommendations, the foremen at the plant were given no written instructions as to qualifications to look for in making promotion decisions, and those qualities that were typically used were vague and subjective. Further, there was no system for informing hourly employees, who were largely black, of promotion opportunities or the qualifications necessary to obtain these promotions. Finally, the evidence in Rowe showed that the plant had a long history of pre-act discrimination and that there was a significant statistical disparity, between the number of blacks promoted or transferred through the above system and the number of whites. Because the process described above provided no protection from the expressions of prejudice by the foremen upon whose recommendations employees relied for promotion, the court found that the promotion process had a disparate impact upon blacks. Rowe, 457 F.2d at 358-59.

.Maitre d' Garrett testified that Joe's always had qualified women but hired male food servers because it was traditionally a male-server establishment. Similarly, Anthony Arneson, the maitre d’ in charge of hiring beginning in 1987, testified that gender was never mentioned by Joe's managers or employees because of a "perception that people didn't even think about” — "that many fine dining establishments throughout the world have an all male staff.”

. See Maddox v. Claytor, 764 F.2d 1539, 1549 (11th Cir.1985) (noting that it is possible for employers to implement guidelines for interviewing officials that would render a subjective interviewing process "a much less practicable mechanism for discrimination” without limiting the officials’ authority).

. Further, because the EEOC has proven that the specific hiring practices of Joe's caused the dearth of women servers, the district court’s finding does not, as Joe’s argues, require the restaurant to hire in accordance with population percentages or implement quotas. Rather, it merely requires Joe's to prevent the perpetuation of hiring practices that have an adverse impact upon women. See Craig v. Alabama State Univ., 804 F.2d 682, 688 (11th Cir.1986) (noting that in light of prior discriminatory practices, "the university had an obligation under Griggs to not utilize selection criteria that maintain the status quo of its racially imbalanced workforce”).

. In addition to Maitre d' Garret's admission, Maitre d’ Arneson, who was in charge of hiring beginning in 1987, testified that gender was never mentioned by Joe's managers or employees because of a "perception that people didn't even think about” — "that many fine dining establishments throughout the world have an all male staff.”
The district court also quoted the testimony of owner Grace Weiss who explained that she "cannot explain the predominance of male servers but perhaps it had to do with the very heavy trays to be carried, the ambience of the restaurant and the extremely low turnover in servers.” Id. at 732. The district court rejected Joe’s "heavy tray” and "low turnover” explanations, and found that the true reason Joe's had only male servers was it excluded women to create a fine-dining ambience with tuxedo-clad male servers. Id. The district court found the evidence established that "women have the physical strength to carry serving trays” and that Joe’s own witnesses, including Maitre d' Arneson and Captain Sutton, had "attested to the fact that women are capable of performing every aspect of a food server’s job at Joe's.” Id. The district court also found the "low turnover” rate did not explain the absence of women food servers. Id. Even with Joe’s "low turnover,” there were still 108 new food servers hired between 1986 and 1990, but none was female.

. The court’s order quoted expert Karen McNeill’s testimony in this regard:
It has been an attitude and standard, it comes from Europe. In all of Europe you will find in all of the grade three restaurants in Europe, there is an impression that service at the high level is the environment of men, and that it ought to be that way. And I think that that attitude a few decades ago came and was felt a little bit here in this country....
Those [European] opinions and those sensibilities, I think were in fact carried here by restauranteurs who hoped to create something serious. If you wanted to create a serious restaurant that would become known in the community, that would become one of the community’s great restaurants, you did what they did in Europe, you modeled yourself after them. I don't think anybody thought about it. They said, well, men did it there. It tended to be men here, too, who had those skill sets, and so men were [sic] automatically became the labor pool.
Id. at 732 (alterations by the district court).

. The majority questions the district court’s use of reputation evidence, but ultimately acknowledges that "a company may be held liable for a discriminatory reputation if there is evidence it caused or perpetuated that reputation through some intentional affirmative act, see Morrow, 491 F.2d at 1055-57; Rath Packing, 787 F.2d at 337.” Even assuming this is correct, there was extensive evidence presented at trial that Joe’s discriminatory hiring conduct created its "male-only" reputation.